So the court says in the first sentence, this is a case governed by the City of Auburn. That's not a microphone. That is not a microphone in front of you. Oh, this is it? Yeah, that's not a microphone. You're going to have to project your voice as if that thing wasn't there. I will try, Your Honor. Thank you for pointing that out, though, because I was deliberately trying to speak into a voice. It's called a recording system. This is a case controlled by the City of Auburn. We all agree, I think, that the first step in the analysis here is 253A. It has to be a showing that the effect of the municipal regulation is prohibitory. We don't agree, however, about how that is done, and the City of Auburn explains that process, and there is simply no way to reconcile the approach taken by the district court in this case with the approach outlined in Auburn, and essentially each and every case that is considered Section 253. The initial confusion I had in this case was trying to determine exactly what ordinances are being challenged and the extent to which they resembled the ordinances that were an issue in the Auburn case. So could you help me with that, please? Well, Your Honor, the best I can do, given the time limit, is to refer you to Cases 15 and 16 of the brief, where we have itemized the respective provisions of the various cities' codes and franchises. This case was made complicated by the fact that it began as a case between Quest and the City of Portland, which would be a much simpler case to discuss, and it was complicated by the intervention of numerous other cities, which, of course, created, by and large, a magnitude greater complexity. Yeah, the counsel on your brief, you just listed ordinances and didn't describe those ordinances in such a way that would permit meaningful comparisons to what you were challenging about those ordinances. It was very difficult for me to discern how you were arguing that those ordinances compared with the ones in Auburn. So I guess you're saying that we need to look at Pages 15 and 16 and glean from that independently what you're challenging? Your Honor, take Page 15. In the cited ordinances, flagged by footnote 29, the relevant ordinances require Quest to submit a business plan indicating the type and quality of the service to be provided. Is that a specific telecommunications ordinance or a business license ordinance? In the case of Ashland and Springfield, Your Honor, I believe it's a specific telecommunications ordinance. In the case of the City of Eugene, it is a business license ordinance. Why do we have jurisdiction? Isn't the jurisdiction in this case with the commission? Your Honor, I think not. As a matter of fact, if you look at 253D, claims under 253C are specifically not relegated to the commission. And as the 11th Circuit indicated in the City of Palm Beach case, there's a clear congressional history of a preference for district court review of municipal regulation. Is there a case that says we have jurisdiction and you don't have to go before the commission first? Yes, Your Honor. There are multiple cases holding that there is no primary jurisdiction in the commission, and the City of Palm Beach case is one of those. That issue was not raised here and is not briefed here. But jurisdiction doesn't have to be raised, does it, counsel? If it's a jurisdiction issue, it can be raised at any time, even by the court. That's correct, Your Honor, and I've tried to cite Your Honor to the case law that comes to mind immediately as responding to Ferguson's question. There are numerous cases holding that the district court has jurisdiction. The legislative history of 253D is quite clear that Congress deliberately empowered the district court review of 253C issues, and that's explicitly discussed in the City of Palm Beach decision. Well, Section D, when you read it, you know, it clearly says that the commission shall preempt the enforcement of such statute of regulation or legal. But it also clearly does not refer to subsection C. What's that? It clearly does not refer to subsection C. It refers to subsection C. Oh, I see. And as the City of Palm Beach case explains, Congress's reason for that was that the cities themselves complained that having to go to Washington to resolve these issues instead of their local district court would be a burden on them. I see. All right. Okay. So to go back to the question of the 253A question, yes, a prohibition does have to be shown, and this court in the City of Auburn case said that that requirement is met when the city enacts a regulatory scheme that allows a city to bar a telecommunications provider from operating in the city if that telecommunications provider will not comply with a level of regulation that Congress did not intend the city to have. So, Counselor, that takes me back to the first question I asked you, and you took me to footnote 29 where you talked about the City of Ashland, the City of Springfield, and the City of Eugene. But your other footnotes through 36 talk about other ordinances, and I'm still at a loss as to how you are interweaving the ordinances into your argument. You talk globally in terms of ordinances, but I think we have to specifically determine the ordinances at issue and how they impact the ability to provide the service, and I'm finding it difficult to do that from your argument and from your brief. Well, I guess the easiest answer to Your Honor's question would be the district court did not even attempt that process. He applied a different test entirely than Auburn imposes. Okay, if we were to agree that perhaps the district court should have applied the Auburn test to the ordinances at issue, how are we to do that if the ordinances are not specified in detail for us? Well, I was in the process of saying one alternative would be that you could remand it to the district court to conduct that type of analysis, which is required by Auburn. The second is, which was of course taken by Auburn, you could directly consider it as an issue right before you. If we do the latter? If you do the latter, Your Honor, I believe that you would find that if you take all the citations, for example, to Ashland, all the citations to Eugene, you find in each of these ordinances a pattern that is prohibited to cities under 253. So you're going to take the chance that we will interpret these ordinances in the way that you believe they should be interpreted rather than you're setting it out for us specifically? Well, at this point in time, I'd be delighted for the opportunity, Your Honor, to brief to you in hate verba the provisions of the ordinances and franchises which have the effects that Auburn says are not allowed in cities. Wasn't that your obligation to do during the briefing period? Well, all I can say to that is if it was, the best that we've done is this and the chart that we have provided to the court in the excerpts of the record, all of which consist of referring to a type of regulatory enactment that is not permitted to cities and citing to the section. A lot of those included business license ordinances, which were not the subject of the Auburn case. They are if they are imposed on a telecommunications provider and those business license requirements have the effect of prohibiting telecommunications. What's your best case authority for the proposition that non-telecommunications ordinances may run afoul of section 253? I think Auburn is the best authority, Your Honor.  that non-telecommunications ordinances may run afoul of section 253. At page 1176 of that decision, a regulatory structure that allows a city to bar telecommunications providers from operating in the city prohibits or has the effect of prohibiting the company's ability to provide telecommunications services. I know of no case which has intimated that cities may regulate in ways that 253A prohibits so long as they call the ordinance a business license ordinance. So it's your argument that we have to survey the entire rubric of ordinances within the city to determine if any of the ordinances within the legislation run afoul of 253? Is that your argument? It's our argument that the provisions that we've called to the court's attention in our brief and in the exit record at tab one are provisions which do run afoul of 253A. And that those provisions run afoul, that the pattern of those provisions is not identical from city to city and therefore there is a separate question as to each city. But that as to each city, those ordinances cumulatively have the effect of regulating in a way which cities are not permitted to regulate. Now the language that you read from Auburn, wasn't that language talking about telecommunications regulation? The ordinances before the court, as in Auburn, as a matter of fact the chart that is here is almost identical to the formal chart that was before the court in Auburn. Some of the statutes in Auburn were specifically telecommunications statutes. Some of them were franchise agreements and some of them were charter provisions just as they are. Were any of them business license provisions? I don't recall that any of them were business license provisions, Your Honor, but I repeat. And I think that the point I was trying to go to in the first instance is that Auburn states a guiding principle for determining when a city is permitted to and not permitted to regulate under 253A. The problem is if there is an ordinance that is of general application, my concern is that there is an effort to bootstrap 253 to cover ordinances that are of general application as opposed to ordinances that are specific to the telecommunications. Your Honor, I think there is absolutely no question that an ordinance of general application, if applied to impose third-tier regulation on a telecommunications provider, is prohibited. And you think Auburn stands for that proposition? I think it does, and more importantly, I think that 253 stands for that proposition. I think that Auburn, that every case that has considered the meaning of 253 has said that Congress wanted to put cities and states out of the business of detailed regulation of the telecommunications business. Regulation of other kinds of businesses that are not preemptive may be entirely appropriate. But as in this case, the cities have recognized from time to time that the general provisions of their ordinances cannot, either under Oregon law or under federal law, be applied to a telecommunications provider. So is your position that a business license ordinance or a nuisance ordinance, any of the generally applied regulations that comprise city ordinance schemes cannot be applied to telecommunications? It's my contention that the ordinances at issue here that purport to contain specific how you do the business of telecommunications regulations are not exempted from 253A because they also apply to other kinds of entities where there is no federal preemption. What if it's an ordinance that doesn't say how one does the business of telecommunications, but how one does business generally in that city? Well, take for example, Your Honor. If a city in its business license ordinance had a provision which said, in order to have a business license in this city, you must get our permission to transfer control of your company to some other owner, which is clearly prohibited under the City of Auburn decision and numerous other decisions applying 253A. The fact that that provision was in a general business license ordinance and applied to drugstores or applied to people who had sidewalk vending machines or something like that would not mean that a city could apply that regulation to a federally regulated business. It would apply to the federal government. In the City of Auburn case, what business license regulations were at issue? Your Honor, as I said, to the best of my knowledge, no specific business license tax, which I think that we're talking in our dialogue here about the City of Eugene and not the other cities. Well, there's a different issue with the City of Eugene that we'll discuss later. I think so far as I'm aware from the cross-section of provisions at issue here, it's the City of Eugene's business license ordinance that is the one of general application to which Your Honor's questions would be most clearly directed. I'm not aware of, in Auburn, an exact parallel to that. How many states does Quest operate? Your Honor, I don't know the answer to that. I believe it's about 10. What's that? Ten, I believe. Ten? Yes. Sorry, I don't know that off the top of my head. Have you brought lawsuits in the other nine states? We have brought lawsuits in most of the states where Quest operates, Your Honor. And you're going to get conflicting opinions. Well, of course, one of the goals of… Isn't that why the presumption part of the statute apply? You first got to go to the commission to have a uniform law throughout the entire United States on telecommunications because it's a national problem, not a local problem. Well, of course, we could never, I don't think, accept the premise that the federal courts are not competent to solve national problems. We certainly think that consistency throughout the Ninth Circuit is important, and one of the serious problems in this case is that we would have major inconsistency with the Telecommunications Act as interpreted in Oregon as compared to its interpretation in Washington and California and Hawaii and the other states of the circuit. Now, Quest does also operate in the Tenth Circuit, so the City of Auburn decision is persuasive there. But it is being followed. It has made law that has been followed by the federal courts throughout the country. Your Honors, I see that I'm running short of time. The second point I'd like to make is that in this case, there is an issue which was not present in Auburn and which is clearly outside the scope of municipal regulation and that is that the city's schemes here for collection of revenues for use of the right-of-way is discriminatory. They do not apply the same major right-of-way fee to all similarly situated telecommunications carriers. Now, I don't argue that they have to charge a uniform charge, not at all, but they cannot have a different and discriminatory provision, and the leading case on that is the Second Circuit's decision in the City of White Plains, which, Your Honor, was specifically endorsed by the Federal Communications Commission in its amicus brief in that case. Lastly, of course, I would argue that the provisions of these ordinances do not pass muster within the safe harbor of 53C, which limits the city's jurisdiction to management of rights of way. And I think that, again, just to conclude by opening, Your Honors, a quest, I'm sorry, the City of Auburn said, this court said in the City of Auburn case, that the goal of Congress was to limit municipalities to the regulation of right-of-ways, that the regulation of the business of telecommunications was a matter uniquely the province of the federal government, and that Congress has narrowly circumscribed the roles of the state and federal government. That policy, that basic intention of the statute is the guideline that should be followed in determining what a city may and may not do. In these ordinances, the cities explicitly and admittedly go beyond right-of-way management. And that was what Congress intended in 1996, was allowed to the cities and all other regulation in the view of Congress was inconsistent with the goal of introducing competition and bringing lower costs to consumers. May I reserve the remainder of my time? You may. Thank you, Counsel. May it please the Court. My name is Jovan Neaton. I'm representing the City of Portland in this matter. I'm here with my colleague, Pam Berry, representing the intervening cities and the City of Eugene. This case... Counsel, are you going to argue exclusively? Are you the only attorney who's going to argue the case? No, she's also going to argue the case. How are you going to... You have about 13 minutes, and she can argue about seven. All right, thank you. At least that's going to be our goal. This case is in Auburn. As I'm going to explain, the issues are different. The circumstances are different, which is, I believe, one of the questions you asked. And the ordinances themselves are very different. And as a result, what Quest is really asking you to do is take Auburn to a place it really does not go. But didn't the district court or the magistrate judge in this case clearly repudiate the ruling of Auburn? No, he did not repudiate the ruling of Auburn. What he recognized is that Auburn was issued initially about April, and then the court amended the opinion in June or July. What the court recognized was that if you focus on epigrams in the decision, you can come to one conclusion about what the court is saying. But under your stare decisis authority in the Ninth Circuit, the key is to look to what the court did. And so what the district court says is there's an unfortunate use of a quote from Bell Atlantic that misquotes the statute. And there's no question it misquotes the statute. But even if the district court disagrees with the way the Ninth Circuit interpreted the statute, isn't the district court still bound to follow the ruling that the Ninth Circuit has entered? The district court is bound to follow the ruling, and that's what it did because what the Ninth Circuit said was in a Section 253 analysis, one first looks at whether the regulation prohibits or has the effect of prohibiting entry into the marketplace. And if you find there is no prohibition, the case is over. Didn't the district court require an absolute prohibition as opposed to a possibility of prohibition? No. The court said you have to find a prohibition or an effective prohibition. But if you look at the Ninth Circuit opinion, it says the same thing in the operative discussion of the analysis. That's the point of the court's discussion. It says there's a point. I can see there's a point in the Ninth Circuit opinion that uses the word may, which could imply that you preempt whenever there is a potential for a prohibition. But if I then look at what the court actually did, Judge Gelders goes on to say, what the court did was look for a prohibition or an effective prohibition. It actually finds an effective prohibition, not a mere possibility of prohibition. And that would be consistent with the FCC's precedent in this area, which Quest concedes is controlling. That requires a prohibition or an effective prohibition. The FCC has rejected the notion that you can preempt based on speculation as to the mere possibility of preemption. And if you look at most of the cases that have been decided, there are very few that turn, in fact, on the mere possibility of prohibition. Because if that was what the law meant, it's hard to imagine what the limits of it would be. It would be extraordinary for Congress to adopt such a law that said if we can speculate a possible way in which this might interfere with a telecommunications company, it's gone. And what makes it particularly unconvincing is if you look at the legislative history, Senator Gorton explains that the purpose of Section 253 is to stop states and local governments from granting monopolies to incumbent providers. We cite the provision in our brief. I believe in the Senate record it's something like 8191. That is served, and the proper limits of Congress are served, by asking are we doing something that is prohibiting competitive entry into the market or having the effect of prohibiting entry. And that's what the judge looked at in this case, and the critical fact in this case is there is no prohibitive effect, none. We actually asked counsel during discovery, asked the question during discovery, there's a set of SEC guidelines which are included as an attachment to the interview brief that say when you present a 253 case to us, we expect you to come in and give us affirmative proof that you're seeking preemption, you have the verdict, that there is an actual prohibition or an effective prohibition. We want you to tell us what services you're being prevented from providing, what effects there are. And we asked that question in Flushton. They said that just, they're just, we can't identify it. We cannot identify a single service that we're being prohibited from providing or effectively prohibited from providing. So, counsel, how do you reconcile the ruling of the district court with the ruling in Auburn? Well, I think the important thing to recognize in Auburn, and this is critical under your stare decisis, I think, is that you have to look at the circumstances. So you don't see this as precedent, you see it as stare decisis? Well, that was, yes, I see it as precedent, as stare. I think the issue Quest is raising is really an issue of stare decisis. As opposed to an issue of precedent? It probably is a better phrase than issue of precedent, but the case law ends up, the case law leaves you in the same set of cases. How do you answer my position that Quest has to first go before the commission to challenge the rules and regulations of local and state governments under the statute? And then the court only has jurisdiction under the Administrative Procedures Act. Now, this is necessary because telecommunications is a nationwide importance. Not a local issue, it's a nationwide importance, and Congress specifically says that it shall be the commission which makes that determination as to whether or not the statute has been violated by the local or state government. And then we examine it under the Administrative Procedures Act. Your Honor, there is obviously case law to the contrary in the 11th Circuit, and even, I believe, Auburn actually suggests it. Which case says that? The 11th Circuit Bell South case finds that the federal courts have jurisdiction. Well, there's no 9th Circuit case that says that. The closest would be Auburn itself, which obviously hurts the case. See, that's the problem. You find circuits disagree, and the telecommunications system is a mass of confusion. And Congress says, we don't want a mass of confusion. We want everybody to know exactly what you can and can't do. The argument here is that because what the parties are seeking is preemption, they can bring an action under the Supremacy Clause. I don't believe there's a private clause of action under any provision of Section 253, for precisely the reason you suggested, that you can bring a Supremacy Clause, that you can, under the Supremacy Clause, raise the issues, raise 253 as a defense to an enforcement action by a city. That raises an interesting jurisdictional issue in my mind, not as to whether the FCC gets it, but whether the issue should be in the state courts, since it would be a defense. But I agree with you that it's a complex issue. I can only say that most of the courts that have considered it have concluded that at least on a Supremacy Clause basis, there is some ground for hearing the matter in the court system, as opposed to giving the FCC primary jurisdiction. Counsel, I want to go back to your point on 253A. Am I correct in understanding your argument that you're saying that a city cannot expressly prohibit or implicitly prohibit? It would be that they cannot expressly prohibit or adopt regulations that have the effect of prohibiting. So I think you're saying the same thing I am. And that is the position that's been adopted by the Federal Communications Commission, and that was repeated in the Auburn case itself. So I don't think we're departing from Auburn. The difference is that in Auburn, you had a... And I think this circumstance is critical. You had a new telecommunications ordinance that required a substantial change in existing business plans in order to either remain in the market or maintain your position in the market. In order to enter the market or maintain your position in the market. That's the point of the discussion of the Abbott Laboratories case in the rightness portion of the decision. But I think the significance of that is that in that case, the court was faced with a situation where they had to decide whether there was a prohibition because it was the fact of going through the process because it caused a substantial change in the business practices that created the harm. So, Counsel, what language are you relying upon in Auburn that convinces you that that was the critical factor upon which the court hinged its rule? There's actually two passages. I actually took a position off the website of the old decision and marked it up so I may not be able to give you the right site. But under the rightness provision, if you look at the Abbott Laboratory discussion, which appears... I see it. You see it? Yes. It says... Page 1171. Right. It talks about... Abbott Laboratories applies in a case where there's a substantial change and where something requires... What language are you reading? Can you see the citation to the Reno Catholic Services, Social Services case? I see that. Let me see. Oh, I don't see that. Oh, yeah, I see it. Yeah. 11, yeah. I don't see where it's talking about the fact that these were newly enacted ordinances as being pivotal. Look at that provision, and then if you look at... But where does it say that the fact that these provisions were newly enacted is pivotal? It says that... I apologize if it's not popping to my mind, but it is in this discussion of Abbott Laboratories, and I will find it before my time. It says, if promulgation of the challenge regulations presents plaintiffs with the immediate dilemma to choose between complying with newly imposed... Is that what you're talking about? That's newly imposed, right. And it says the controversy is ripe. It doesn't say that that's pertinent for purposes of determining the preemption issue. Well, the reason it's pertinent for the preemption issue is that in order to get to the point of deciding the case for ripeness, you have to decide there was an immediate, substantial change in business operation that's required by the activity. Otherwise, the rule of law requires you to consider the issues as applied. But that doesn't say, then, that existing regulations cannot run afoul of Section 253. No, but I think if you're looking at what happens when you have new regulations that test and require a substantial change in a business plan, you're in a different circumstance than what you have here, which is you have existing regulations. But you still have the... What West is looking at is how do I escape franchises I wrote, a franchise fee that I actually... a privilege tax I actually told the legislature was reasonable and should adopt, and how do I claim... that I've been living with for 70 years that have had no impact on me? What they want to argue is that in that circumstance, Auburn requires you to ignore the facts. So you're saying that Auburn and Quest had not been living with the franchise fee? No, they had not been. In fact, in Auburn, one of the critical points of Auburn is there was no franchise fee and no privilege tax at issue because Quest actually withdrew those from the case. And you've shown it in the excerpts of record at 428. You'll see the citation to that withdrawal. So you not only didn't have one of the critical issues in the case... In fact, this case is really about money. That's what drove this. Quest simply stopped paying its franchise fees and privilege taxes. Those weren't even at issue in Auburn. Now, I'm running short on time. I want to give my counsel a chance to argue. I wanted to point... Besides that, I wanted to point to one other issue. You asked what were the central cases. The Abbott Laboratory discussion, I apologize. I can't point you to the precise change. Maybe I can before the end of her argument. But the other factor that I think is relevant is that Quest relies on a statement that says any ordinance that allows you to prohibit entry is a prohibition within the meaning of 253A. What they're citing to is a paragraph that actually is one of the paragraphs preceding a major change that was made in this opinion when it was amended. What the court goes on to say is not that the mere fact that one can deny a franchise is a prohibition under 253A. If you look at footnote 11 of the decision, what you'll see is the court emphasizes that in fact, the court actually emphasizes  What was at stake in Auburn was a combination of ordinances which on the facts alleged, because the case was decided on stipulated facts, amounted to a prohibition. And your question at the beginning, which was tell me what's at issue at stake in the ordinances, is really critical here. Because what the court was objecting to in Auburn was a detailed application process. Here the record shows the Portland application process is one page. A right to revoke for any reason. Here, the revocation provisions of the TRP, which is section O of the temporary revocable permit under which Quest is operating, doesn't even allow us to terminate as long as there is a pending dispute in good faith as to any provisions. And there's specified notices and opportunity to cure and due process protections. This is not a case that has any... This is not a case that in fact has the combination that was at stake in Auburn. It's a case where you have existing provisions and the key here is there's no harm. This case, this is a case where you've got 30 telecommunications providers with franchises, 15 operating. You've got Quest unable to identify a single problem. And the question is, where there's no prohibition, how can you find a prohibition under subsection A? I don't think Auburn can help finding a prohibition where there is no prohibition in fact. Thank you. Thank you. May it please the court. Good morning. I'm Pam Geary. I'll be arguing on behalf of the intervening cities, including Eugene this morning. To first answer the question the court has posed to my co-counsel, the Auburn opinion at 1170 describes the newly enacted city ordinances as an issue in that case. The reason that that's important, Your Honors, is that it goes to the question of whether the ordinances have a prohibitory effect under 253A. It is our position that, in our case, where Quest is operating under long-standing, existing franchise agreements, that the factual distinctions in the cases are significant in fact. And that's at 1170. The district court, in response to Your Honors' question, did exactly follow Auburn. And quoting from page 1255 of the magistrate judge's opinion, he faithfully and diligently followed the Auburn as to how the law applies to the particular case we have in front of you. The thing that distinguishes our case is the facts, and that's what I'm here to present this morning. I hope to answer, to your satisfaction, questions about the ordinances at issue. I have set in front of you a set of three sheets that are 8 1⁄2 by 11 in duplication of these oversized exhibits to aid in your review as I walk through this. Our point is simple. The outcome advocated by Quest is not only wrong, but it is not required by Auburn for four reasons. First are these significant factual distinctions between our case and Auburn. In order for Quest to prevail here, you would have to accept the premise that state and local laws can be prohibitions under 253A, even where the factual record incontrovertibly establishes that those laws have not prohibited the provision of a single service. Also on the second page of the handout that you gave of the first page of text, you say the franchise application requirements are not applicable to Quest. Yes. And so where in the record does it show that these application requirements are not applicable to Quest? Your Honor, the city submitted into the record each regulation, and you'll find the applicable regulations in Volume 1 of the city's, intervening the city's excerpts of record. As to the not applicable provision, that ordinance appears at pages 7 through 11 of Exhibit B in Volume 1. And so just without me having to look there, what does it say that would exempt Quest from these provisions? Where you'll find the specific reference to how Quest operates, and this is Ashland, the first city on the chart. Let me just digress for a moment and tell you that the list of factors on the left are those that the Auburn panel identified as offensive or troublesome, and that's the reason we've referred to them here. There's an affidavit in the record from Paul Nolte, who is the city attorney for the city of Ashland. In his affidavit, he states that Quest, in fact, is operating under a franchise in that city, that they were not required to go through the application process. Was that before the court? Yes, Your Honor, and I'll try to find it here. That's all right, I'll find it, so you can use your time arguing. Thank you. Okay, moving on. So the first distinction is the facts, and if I get a chance, I'll get back to the chart. I hope I will. The second critical distinction in our case is that any suggestion that the Auburn panel decided the question of gross revenue-based fees under the Telecom Act is wrong. You need only look at footnote 10 of the panel's amended opinion to see that this issue, which is, in fact, fundamental in our case, the gross revenue-based fee issue, was not even before the Auburn court. Third, over a century of precedent, over 80 contracts in Oregon alone, and important principles of federalism that are expressly recognized in Section 253C, this same provision, dictates that the city's franchise agreements and regulations concerning right-of-way management be preserved. The fourth and final point is that the court's analysis of Section 253 needs to be informed by Section 601, which is also part of your packet and which is replaced here as well. Section 601 expresses Congress's clear intent that there be no implied preemption of local law. So the standard that Quest needs to meet here and the burden that it has failed to meet here under the Congress's intent and under the FCC guideline, which, by the way, is grouped in pages 5 to 10 of the appendix to our brief, Intervening City Rules. And also the difficulty I'm having is the same one I expressed previously. The district court did not go through and do the analysis that you're now urging us to adopt. The district court made sort of a global ruling regarding the ordinances at issue, and it's difficult for me to follow your argument when the district court did not go to that detail in terms of making this ruling. I understand what you're saying, and let me walk you through what I think the district court did and why I think it's nevertheless correct. And the pivotal passage is at page 1255 of the judge's opinion. What the court did, consistent with Auburn, despite what folks may say, is look first to determine whether there was a showing of any prohibition. Unless you have a showing by Quest who has the burden of showing that prohibition, unless they make some showing of a prohibition under 253A, there's no need to walk through every ordinance provision. When you then decide that there has been a showing of a prohibition... Well, it's not a showing. It has made prohibit or have the effect of. So you don't have to show a show... You don't have to make an actual showing of prohibition. It can also be the effect of it. And in Auburn, the panel found that the combination of the requirements had the effect of. The business may nevertheless continue to operate, but the court still found that the combination of those ordinances had the effect of prohibiting entry into the marketplace. What I think you're absolutely correct, there is the possibility of effective prohibition. There is still a requirement that some service be effectively prohibited. And what is the language in the city of Auburn that you're relying upon to support your argument that there first must be a showing by the telecommunications provider before we get into the analysis of the ordinances? At page 1175... Of the city of Auburn? Of Auburn, beginning in the preemption discussion. First, it is important to note, as my co-counsel pointed out, right at the beginning of... There's a capital T heading, the preemption by federal law there. Auburn went up to the Ninth Circuit on the facts alleged, in other words, on pleadings. There was no proof. So the court did not have the benefit of the record you have in front of you this morning. When you get down to C-1, preemption, Section 253A, the court correctly quotes 253A, talks about the bar to operation, and concludes that discussion on 1176. Of course, the language that says there first must be a showing, a prohibition, before we analyze the effect of the ordinance. Where is that language? Actually, I'm drawing that language from... I don't think the court quoted or analyzed that, and I think that was one of the failings of the analysis. What I'm quoting from is the Federal Communications Commission's regulation on this very same topic, which is reproduced at appendix page 5 of our brief. And it states specifically at page 2, that a party complaining under 253A needs to show that there is a specific telecommunications service or service prohibited or effectively prohibited from being provided. There is other authority beyond the Ninth Circuit that follows this rule. Universally, courts will take a two-step approach to 253, first looking at whether there's any showing under A, and only arriving at C to save regulations. But the district court really didn't do that either. Let me tell you what the district court did then. Briefly, because you're way over your time. Thank you. I'll just make one quick point here. On page 1255, the court noted that he was following orders, that a correct reading of the statute made it clear that the preemption test is as I'm reciting it. If the challenged requirements do not prohibit the ability to provide a service, then the court does not preempt. And he cites the City of Eugene case, which is fine and precedent in our state. All right. Thank you, counsel. We'll give you two minutes for rebuttal. Thank you, Your Honor. On this issue of prohibitory in the FCC regulation, if this were proceeding before the FCC, the petition and the showing would be that the cities prohibit all telecommunications services by Quest. Because they do not permit Quest to operate at all within their service territory unless Quest agrees to comply with the illegal regulations. And the FCC has said repeatedly that the standard that it applies in the 253C is whether the city's regulation materially inhibits or limits the ability of a competitor or potential competitor to compete in a fair and balanced legal and regulatory environment. And the commission has gone on to say that its view of that standard is that when a municipality attempts to impose so-called third-tier regulation, that is, when it attempts to act like a little local PUC, then it is materially impairing the ability to compete in a, quote, fair and balanced legal and regulatory environment within the meaning of what Congress said in 253A. So if this were proceeding in the FCC, the services that would be prohibited would be everything that Quest does. Because these statutes very clearly prohibit Quest from doing any business within the jurisdiction of these municipalities unless it complies with these illegal regulations. What's your response to opposing Council's representation that when interlocutories were propounded to Quest, Quest was not able to identify one single service that it was prohibited from producing? I think that if Your Honor looks at the portions of the record to which Council refers, the question was, what effect do the continuation of these illegal prohibitions have on your ability to provide services? And that was couched illegal prohibitions? No, the question was, what was the effect of these prohibitions? And the answer was, we can't tell, looking forward, what would happen if you continue to operate under the monopoly environment that Congress outlawed. We can't tell you which services would go first. We can't tell you what kind of competitive reaction we'd be precluded from engaging in. But it's clear... I thought the response was none, according to opposing Council. Well, as with opposing Council's chart, and for us to be the advocacy, I think Council has oversimplified. But the context of the answer was, we cannot predict what the continuation of these regulations, what the long-run effect of these regulations will have on our service. We agree that in the pre-1996 environment, these regulations existed, and we operated under them. We agree that they have not put us out of business so far, although the effect of these regulations has materially impaired our ability to carry out the intent of Congress and compete in a fair and competitive regulatory environment. These are exactly the kinds of municipal regulations which Congress intended to take away from cities and to give to cities the power to control their own rights away. You're saying that these ordinances have had no effect, as of right today, according to your operations. Oh, not at all, Your Honor. I'm saying that these ordinances materially impair our ability to react to the new regime that Congress imposed. They make us semi-regulated utilities instead of deregulated utilities. As a result... It hasn't affected your operations. I'm talking about your operations. Certainly it has. Your service to the public. We have not been precluded from providing a service, but to say that our operations haven't been affected when costs are higher, when we have to engage in regulatory compliance steps that we shouldn't be for the private sector, those have an effect on our operations. Those are exactly the things that were meant to be swept away by deregulation. Just one word on franchise fees and the offering of securities. Counsel has represented several times in briefs and in argument that we waived a franchise fee argument in Auburn. I argued the Auburn case. I wrote the briefs in the Auburn case. That absolutely did not happen. An issue in the Auburn case was a tax of general applicability to all utilities. And that had been challenged in the initial pleading. And early in the case, Quest conceded that that was a general tax that didn't apply exclusively to telecommunications and it was a tax, not a franchise fee, and not a right-of-way use fee. And it was on that basis that it went out of the case and that basis only. The panel in Auburn repeatedly said that non-cost-based fees violate the intent of 253A. Thank you, Your Honor. All right, thank you, Counsel. The case is argued stand submitted. That completes the calendar for today and we are in recess. All rise. Thank you.
judges: Alarcon, Ferguson, Rawlinson